IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| JOHN GENTRY, ) | |
| ) | Civil Action No. 2:19-00873-MBS |
| Plaintiff, ) | |
| ) | |
| v. ) | **OPINION AND ORDER** |
| ) | |
| BIOVERATIV U.S. LLC, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

Plaintiff John Gentry ("Plaintiff") brought the within action against Defendant Bioverativ U.S. LLC ("Defendant") in the Court of Common Pleas for Berkeley County, South Carolina. The action was removed to this court on March 22, 2019. Plaintiff claims Defendant wrongfully terminated his employment in violation of public policy. Plaintiff also alleges the termination gives rise to a violation of the South Carolina Payment of Wages Act as well as claims of promissory estoppel, conversion, and defamation.

This matter is before the court on Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), filed on March 29, 2019. ECF No. 5. Plaintiff filed an opposition to Defendant's motion on April 18, 2019, ECF No. 10, to which Defendant filed a reply on April 25, 2019, ECF No. 11. The court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

**FACTUAL BACKGROUND**

Plaintiff began his employment with Defendant's predecessor, Biogen, on September 3, 2013, as the company's hemophilia account executive. ECF No. 1-1 at ¶¶ 7, 9. Defendant is a company that specializes in the development and sale of pharmaceutical products to treat hemophilia and other blood disorders, ECF No. 5-1 at 1, and was formed from Biogen's

hemophilia division in February 2017, ECF No. 1-1 at ¶ 8. In early January 2018, Plaintiff learned that Sanofi Genzyme had purchased or was planning to purchase Defendant for approximately $11.6 billion. *Id.* at ¶¶ 2, 12, 13.

On February 22, 2018, Plaintiff received a telephone call from Jim Snider, Defendant's vice president of sales. ECF No. 1-1 at ¶¶ 11, 15. Mr. Snider told Plaintiff that a physician had complained that Plaintiff had "sent a link to a press release, letting everyone know about the publishing of a study for an off-label use of a product sold by Plaintiff's former employer." *Id.* at ¶ 17. Mr. Snider told Plaintiff that "by sending the link, Plaintiff's act constituted the promotion of off-label use of the medicine," a compliance violation, and informed Plaintiff that he was fired as a result. *Id.* at ¶¶ 11, 15, 20. Plaintiff was terminated February 22, 2018, two weeks prior to the anticipated Sanofi Genzyme acquisition of Defendant. *Id.* at ¶ 11.

Plaintiff asserts that Titles 33 and 35 of the South Carolina Code require business entities to "engage in mergers and acquisitions in such a manner that a shareholder and employee with stake in a company is entitled a complete transfer of rights upon merger and acquisition." ECF No. 1-1 at ¶ 37. He alleges that with the acquisition he would have received substantial "stock rights," and that as a result of his termination "he suffered significant stock and value losses"; he was "also denied payment for his 2017 Fourth Quarter performance commissions/bonus in excess of $10,000." *Id.* at ¶¶ 29, 34. Plaintiff asserts that he "had a clean employment record" and "no compliance violations." *Id.* at ¶¶ 21, 22. He alleges that "Defendant itself released and disseminated the same information," which was set forth in the public press release, and that "Defendant falsely accused Plaintiff of promoting off-label use of medicine as pretextual grounds to terminate Plaintiff's employment." *Id.* at ¶ 25.

**LEGAL STANDARD**

Defendant moves to dismiss the entire complaint under Rule 12(b)(6). A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests the legal sufficiency of a complaint. *Schatz v. Rosenberg*, 943 F.2d 455, 489 (4th Cir. 1991). While the complaint need not be minutely detailed, it must provide enough factual details to put the opposing party on fair notice of the claim and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S 544, 555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Additionally, a complaint must contain factual content that allows the court to reasonably infer the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "Facts that are 'merely consistent with' liability do not establish a plausible claim to relief." *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). *See* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–236 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action").

The court must accept the allegations in the complaint as true and draw all reasonable factual inferences in favor of the party opposing the motion. *Iqbal*, 556 U.S. at 679. However, the court will not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Nathan*, 707 F.3d at 455 (quoting *Wag More Dogs, LLC v. Cozart,* 680 F.3d 359, 365 (4th Cir. 2012)). To determine plausibility, a court is to "draw on its judicial experience and common sense"; and if the court determines that the factual allegations can "plausibly give rise to an entitlement to relief," dismissal is not warranted. *Iqbal*,

556 U.S. at 679. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

## DISCUSSION

### I. Wrongful Discharge in Violation of Public Policy

Defendant argues that Plaintiff's first cause of action should be dismissed because Plaintiff "fails to identify a clear mandate of public policy that Bioverativ violated by terminating his employment." ECF No. 5-1 at 4. Defendant asserts that South Carolina is a state committed to at-will employment, the narrow exception to which is available only when the discharge of an employee violates a clear mandate of public policy. Defendant contends that "[w]hile Plaintiff vaguely alleges that Titles 33 and 35 of the South Carolina Code protect shareholders and employees, Plaintiff fails to identify any provision that protects employees from termination prior to an acquisition." *Id.* at 7. Defendant further contends that no such provision exists and that "Plaintiff's vague reference to general code sections" falls short of "satisfying his obligation to identify a clear mandate of public policy that Defendant violated." *Id.*

In response, Plaintiff asserts that he has sufficiently pleaded a cause of action because he alleges that Defendant "terminated his employment so as to avoid paying him stock options he would be due after the acquisition was finalized." ECF No. 10 at 5-6. Moreover, Plaintiff asserts, the issue he raises is novel in this state and "thus, deserving of further development of facts." *Id.* at 6.

In reply, Defendant reasserts that "no provision in the South Carolina Code prohibits employers from terminating employees prior to a merger or acquisition." ECF No. 11 at 3. Defendant also argues that to the extent Plaintiff contends the issue is novel and therefore should

4

not be decided at the pleadings stage, the court determines what constitutes public policy as a matter of law. *Id.* at 4.

South Carolina has a strong policy favoring at-will employment. *Taghivand v. Rite Aid Corp.*, 768 S.E.2d 385, 386 (S.C. 2015) (citation omitted). Therefore, "absent a contractual provision to the contrary, an employee may be terminated at any time for any reason or no reason, with or without cause." *Id.* (citing *Barron v. Labor Finders of S.C.*, 713 S.E.2d 634, 636 (S.C. 2011)). However, "[w]here the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises." *Lawson v. South Carolina Dept. of Corrections*, 532 S.E.2d 259, 350 (S.C. 2000) (quoting *Ludwick v. This Minute of Carolina, Inc.*, 337 S.E.2d 213, 216 (S.C. 1985)). South Carolina courts have expressly recognized two examples of when the exception applies: (1) "when an employer requires an employee to violate the law"; or (2) "the reason for the employee's termination was itself a violation of criminal law." *Id.* (citation omitted). In answering a question certified to it by the District of South Carolina, the South Carolina Supreme Court explained in 2015 that although the public policy exception "is not limited" to the above two examples, the court has "specifically recognized no others." *Taghivand*, 768 S.E.2d at 387 (citation omitted). The *Taghivand* court further instructed that "[t]he primary source of the declaration of the public policy of the state is the General Assembly; the courts assume this prerogative only in the absence of legislative declaration." *Id.* (quoting *Citizens' Bank v. Heyward*, 133 S.E. 709, 713 (S.C. 1925)).

In *Taghivand*, the court examined the statutory and common law authorities governing obstruction of justice, which the plaintiff asserted established a basis for a public policy exception to protect the good faith reporting of suspected crime. The court declined to

5

extrapolate from those authorities a "broad public policy favoring the reporting of crimes," noting that "the plain language of the statute does not support [the plaintiff's] assertions." 768 S.E.2d at 387. Plaintiff argues in response to the motion to dismiss that *Taghivand* is inapposite because the case involved an employee who was terminated after he reported his suspicion of shoplifting to the police. ECF No. 10 at 6. While the circumstances of Plaintiff's termination are certainly different, the guidance set forth in *Taghivand* is clear and easily applied here.

In essence, Plaintiff urges the court to recognize as public policy the need to protect employees from termination on the eve of acquisition when the employee stands to realize a financial gain as a result of the acquisition. *See* ECF No. 10 at 5-6. However, Plaintiff does not cite the court to specific statutory authority setting forth the legislature's intent to offer that sort of protection. Plaintiff contends that Titles 33 and 35 of the South Carolina Code require employers like Defendant "to engage in mergers and acquisitions in such a manner that a shareholder and employee with stake in a company is entitled a complete transfer of rights upon merger and acquisition." ECF No. 10 at 6. Title 33 of the South Carolina Code is titled Corporations, Partnerships and Associations and contains 35 chapters; Title 35 is titled Securities and contains six chapters. As a practical matter, without a citation to the statute(s) Plaintiff relies on, the court cannot examine the statutory language Plaintiff contends gives rise to the public policy that Defendant allegedly violated. Furthermore, other courts have found that a general, imprecise reference to a body of statutory authority is insufficient to support this type of claim. *See Holt v. ARES Security Corporation*, No.: 7:17-cv-03173-AMQ, 2018 WL 2461992, at *2 (D.S.C. Jun. 1, 2018) ("In order to allege a violation of a clear mandate of public policy, a plaintiff must identify and state a source of a clear mandate of public policy, or 'set forth specific allegations that would enable the court to determine what public policy was violated'") (citations

omitted). *See also McNeil v. South Carolina Dep't of Corrections*, 743 S.E.2d 843, 847 (S.C. App. 2013) (explaining that "a litigant must allege more than a general statement that her discharge violated public policy," and specifying that "[t]he complaint must set forth specific allegations that would enable the court to determine what public policy was violated.").

In any event, the duty set forth in Titles 33 and 35, as articulated by Plaintiff, does not reflect the public policy he asserts as the basis for his claim. Plaintiff does not allege that he was an employee or shareholder at the time of the acquisition. Nor does Plaintiff allege that Defendant prevented him as a shareholder or as an employee from a complete transfer of his rights at the time he was terminated. Rather, Plaintiff alleges that he was "entitled" to receive "significant stock rights" as of the date of the acquisition; that is, Plaintiff owned fewer stocks on the date of his termination than he would have owned had he remained in Defendant's employ at the time of the acquisition. ECF No. 1-1 at ¶¶ 26-29. Indeed, Plaintiff asserts in his response that Defendant fired him "so as to avoid paying him stock options he would be due after the acquisition was finalized." ECF No. 10 at 5-6. Even relying on Plaintiff's interpretation of the statutory authority, there is no indication that the legislature has created public policy to protect employees from termination resulting from the employer's cost/benefit analysis on the eve of a merger or acquisition. Nor has Plaintiff directed the court to controlling (or persuasive) case law to any such effect. Nor has Plaintiff persuaded the court that the matter of interest herein at issue is so firmly rooted in the mores of this state that the court should recognize it as public policy in the absence of any clear guidance from the state legislature.

Finally, Plaintiff asserts that he raises a novel issue with this claim and even if the court finds no clear statutory authority for recognizing public policy, the matter is "deserving of further development of facts." ECF No. 10 at 6. In two instances, South Carolina courts have

held that dismissal of a claim for wrongful discharge in violation of public policy was not appropriate due to a case's procedural posture, and that the court should allow the parties to further develop the facts of the case in light of the novel issues presented. *Garner v. Morrison Knudsen Corp.*, 456 S.E.2d 907, 909–10 (S.C. 1995); *Keiger v. Citgo, Coastal Petroleum, Inc.*, 482 S.E.2d 792 (S.C. App. 1997). However, the court determines what constitutes public policy as a matter of law, *Barron*, 713 S.E.2d at 638, and the facts surrounding Plaintiff's termination here bear no resemblance to the sensitive concerns at issue in either *Garner* or *Keiger*. *See Garner*, 456 S.E.2d at 909-10 (holding dismissal of action for wrongful discharge in violation of public policy for failure to state a claim inappropriate where employee alleged termination in retaliation for reporting and testifying about radioactive contamination and unsafe working conditions at nuclear facility); *Keiger*, 482 S.E.2d at 794 (similarly holding that dismissal of action for wrongful discharge in violation of public policy for failure to state a claim was inappropriate in light of the novel issue presented of whether "an employer's retaliatory discharge of an employee who threatens to invoke her rights under the Payment of Wages Act is a violation of a clear mandate of public policy."). *See also McNeil*, 743 S.E.2d at 847 (distinguishing *Garner* on the basis that "the existence of radioactive contamination and unsafe working conditions is a matter of public interest and public policy"; and distinguishing *Keiger* on the basis that "a violation of the Payment of Wages Act is a violation of a clear mandate of public policy, and the employee specifically alleged her termination was in retaliation for reporting her concerns to the proper authorities."). Nor has Plaintiff articulated the basis for his claim so as to create "cause for doubt" or suggest that the "ends of justice may well be promoted" by further fact finding. *Kennedy v. Henderson*, 346 S.E.2d 526 , 527-28 (S.C. 1986) (citation omitted). *See Holt*, 2018 WL 2461992, at *3 (disagreeing with plaintiff that "further

8

factual development" was necessary for claim of wrongful discharge in violation of public policy and dismissing claim under Rule 12(b)(6)).

For these reasons, the court will grant the motion to dismiss as to the wrongful discharge claim.

## II.     South Carolina Payment of Wages Act

Plaintiff alleges that Defendant violated his rights under the South Carolina Payment of Wages Act (the "Act"), S.C. Code Ann. § 41-10-10 *et seq.*, by failing to pay Plaintiff "for all services rendered for the benefit of Defendant." ECF No. 1-1 at ¶¶ 41-43. Defendant argues that the claim fails as a matter of law because the Act does not apply to prospective wages and because Plaintiff fails to allege a contract or policy under which he is entitled to the wages he seeks. ECF No. 5-1 at 8-12. Plaintiff asserts in response that he is not claiming prospective wages but wages "he previously earned prior to termination." ECF No. 10 at 8. He further asserts that he had an implied agreement with Defendant regarding the wages he now seeks. *Id.* at 9. In reply, Defendant contends that Plaintiff relies on wholly conclusory allegations to support those positions. ECF No. 11 at 6-8.

The Act was designed to "protect employees from the unjustified and willful retention of wages by the employer." *Barton v. House of Raeford Farms, Inc.*, 745 F.3d 95, 105 (4th Cir. 2014) (quoting *Rice v. Multimedia, Inc.*, 456 S.E.2d 381, 383 (1995)). The Act requires an employer to timely pay all wages due and provides that when an employer discharges an employee it must timely pay him all wages then due. S.C. Code Ann. §§ 41-10-40, 41-10-50. The Act defines "wages" as:

> all amounts at which labor rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or other method of calculating the amount and includes vacation, holiday, and sick leave payments which are due to an employee under any employer policy or employment contract.

9

*Id.* at § 41-10-10(2). The Act does not apply to prospective wages. *Mathis v. Brown & Brown of South Carolina, Inc.*, 698 S.E.2d 773, 783 (S.C. 2010). When an employer violates §§ 41-10-40 or 41-10-50, "the employee may recover in a civil action an amount equal to three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees as the court may allow." S.C. Code Ann. § 41-10-80(C).

Plaintiff argues that the basis of his claim is not for prospective wages but for wages he earned prior to his date of termination. For support, Plaintiff references the following allegations set forth in the complaint:

> Defendant did not pay Plaintiff for all services rendered for the benefit of the defendant.
>
> ECF No. 1-1 at ¶ 43.
>
> Plaintiff was able to liquidate some of his stock ownership but suffered significant stock and value losses due to the wrongful termination. Plaintiff had only 24 hours to make changes to the stocks that had vested that he could still receive. The stocks were far fewer than what Plaintiff should have received. Through such actions, Defendant failed to appropriately pay Plaintiff in violation of the SCPWA.
>
> *Id.* at ¶ 44.
>
> Defendant failed to pay Plaintiff the due wages, which he was entitled to receive in a timely fashion in the next paycheck, as required by S.C. Code Ann. § 41-10-40 and 50.
>
> *Id.* at ¶ 46.

Plaintiff asserts that these allegations show is he "alleging wages already earned." ECF No. 10 at 8. Defendant argues in reply that these allegations are devoid of any factual reference to "pre-termination wages Plaintiff did not receive." ECF No. 11 at 8. Defendant asserts that the complaint read as a whole demonstrates that Plaintiff seeks stock rights and additional

compensation to which he would have been entitled had he remained employed by Defendant through March 2018:

> The timing of Plaintiff's termination is highly suspect because [] the acquisition that was to happen a mere two weeks [] entitled Plaintiff to significant stock rights.

> ECF No. 1-1 at ¶ 26.

> Plaintiff was entitled to restricted stock units. The stocks fully vest over a 3-year period and Plaintiff was going to receive that stock upon sale of Bioverativ in March 2018.

> *Id.* at ¶ 31.

> Plaintiff would have made about an additional $34,000 by staying with the company through the end of the year.

> *Id.* at ¶ 32.

> Plaintiff would have been paid approximately over $75,000 as part of the acquisition.

> *Id.* at ¶ 33.

The allegations show that Plaintiff's claimed injury amounts to compensation he would have received as a function of the acquisition, which occurred two weeks after he was terminated, and not compensation he was owed as of the date he was terminated. Plaintiff confirms as much in his discussion of the wrongful discharge claim in response to the motion to dismiss: "Plaintiff has sufficiently pled that the Defendant terminated his employment so as to avoid paying him stock options he would be due after the acquisition was finalized;" "Defendant sought to fire Plaintiff on pretextual grounds in order to avoid proper payment to Plaintiff upon the merger that occurred only two weeks after Plaintiff's termination." ECF No. 10 at 5-6. Accordingly, the court agrees with Defendant that Plaintiff seeks prospective earnings, which are not available under the Act.

Defendant also contends that this claim should be dismissed because under the statutory definition of "wages," no payment is due absent an employer policy or employment contract requiring the payment of wages. ECF No. 5-1 at 9. That is, the Act does not provide an independent cause of action for the collection of wages but rather enforces an existing contract or agreement. Defendant asserts that Plaintiff fails to establish either that they were parties to an employment contract or that Defendant has a policy in place under which the wages Plaintiff seeks are due. Plaintiff argues in response that "an agreement was formed by Defendant's conduct of employing and paying Plaintiff consistently and steadily for approximately 6 years," and that they were parties to an "implied agreement, be it through contract or policy . . . ." ECF No. 10 at 9. Defendant asserts on reply that "a plaintiff cannot establish a contractual right to certain wages under the SCPWA by merely alleging an employer-employee relationship," and that with respect to the Act, the amount of wages due must be determined by reference to the agreement the employer entered into. ECF No. 11 at 7. Defendant further asserts that "[n]ot only does Plaintiff fail to allege a contract entitling him to any wages due, Plaintiff fails to plead any factual allegations regarding Defendant's alleged failure to pay him wages due during his employment." *Id.*

The court notes that in addition to the stock rights to which Plaintiff was entitled upon the date of acquisition, Plaintiff asserts that he was "denied payment for his 2017 Fourth Quarter performance commissions/bonus in excess of $10,000." ECF No. 1-1 at ¶ 34. Plaintiff was terminated on February 22, 2018, *id.* at ¶ 11, and therefore was discharged after he rendered sales services during the 2017 calendar year. However, as Defendant asserts, the employment agreement or policy is the source of recovery, not the Act itself. *See, e.g., Anselmo v. West Paces Hotel Group, LLC*, No. 9:09–2466–MBS, 2011 WL 1049195, at *10 (D.S.C. Mar. 18,

2011) ("the South Carolina Payment of Wages Act creates a right to be paid wages due based upon an employment contract . . . . [t]he contract is the source of the right to wages for PTO, not the South Carolina statute").  The complaint makes no reference to a contract, agreement, or policy and certainly makes no reference to Defendant's payment structure, nor does the complaint otherwise set forth the terms under which Defendant agreed to compensate Plaintiff for his services.  Accordingly, the court finds Plaintiff fails to state a claim for violation of the Act and will grant the motion to dismiss as to this claim.

### III. Promissory Estoppel

Plaintiff alleges the following in support of his promissory estoppel claim: "Defendant promised stock rights to Plaintiff as a benefit of his continued employment with Defendant"; "Defendant breached that promise and retained Plaintiff's restricted stock units, bonus, income due at the end of 2018, and other monies and stocks due to Plaintiff"; "Defendant knew Plaintiff qualified for, earned, and desired to receive all benefits owed for employment with Defendant"; "Plaintiff relied on Defendant's promises"; "Plaintiff's reliance was reasonable and foreseeable"; and "[a]s a direct and proximate result of Defendant's acts as alleged above, Plaintiff has been damaged in an amount to be proven at trial."  ECF No. 1-1 at ¶¶ 49-54.  Plaintiff also asserts that he should be allowed to "recover in equity for the reasonable value of his services, where [he] conveyed the benefit of his services on Defendant without receiving the benefits that he had earned for which Defendant realized such benefit," and that the "retention of such benefits by Defendant, specifically the money and stocks that should have been paid on Plaintiff's behalf, is unequitable."  *Id.* at ¶ 55.

Defendant moves to dismiss the promissory estoppel claim as an "improper attempt to circumvent South Carolina's at-will doctrine."  ECF No. 5-1 at 13.  Defendant asserts that

13

promissory estoppel is not a basis for recovery within the context of an at-will employment relationship and that, in any event, Plaintiff's allegations are conclusory and fail to include the specific facts necessary to state a plausible claim. In response, Plaintiff disagrees that a promissory estoppel claim is inappropriate in this context and further asserts that he has adequately alleged the elements of the claim. ECF No. 10 at 9-12.

To establish a claim for promissory estoppel, a plaintiff must demonstrate the following:

> (1) a party made a promise unambiguous in its terms; (2) the party to whom the promise is made reasonably relied on the promise; (3) the reliance was expected and foreseeable by the party who made the promise; and (4) the party to whom the promise is made sustained injury in reliance on the promise.

*Anthony v. Atlantic Group, Inc.*, 909 F. Supp. 2d 455, 484 (D.S.C. 2012) (quoting *Stevens & Wilkinson of S. Carolina, Inc. v. City of Columbia,* 721 S.E.2d 455, 460 (S.C. App. 2011) (further citation omitted)). "The applicability of the doctrine of promissory estoppel depends on whether the refusal to apply it would virtually sanction the perpetration of fraud or would result in other injustice." *Citizens Bank v. Gregory's Warehouse, Inc.*, 375 S.E.2d 316, 318 (S.C. App. 1988); *Craft v. S. Carolina Comm'n for Blind*, 685 S.E.2d 625, 627 (S.C. App. 2009).

The court agrees with Defendant that the settled law in this state precludes application of the equitable doctrine of promissory estoppel in the employment context. In an employment relationship, regardless of whether the terms of employment are reduced to writing, there exists a mutual understanding between employer and employee as to the exchange of payment for work or services rendered. "Promissory estoppel comes into play in situations where actual consideration is not present; it acts as a consideration substitute." *Glover v. Lockheed Corp.*, 772 F. Supp. 898, 907 (D.S.C. 1991) ("Employment relations are necessarily contractual, even if the employment is on an at will basis . . . . Consequently, because some sort of contract exists in every employment arrangement, the doctrine of promissory estoppel is inapplicable"). *See*

*Conner v. City of Forest Acres,* 611 S.E.2d 905, 910 (S.C. 2005) (explaining, in the context of considering whether an employee handbook gives rise to contractual obligations, that "South Carolina recognizes the doctrine of at-will employment. This doctrine provides that a contract for employment may be immediately terminated by either employer or employee when unsupported by consideration other than the employer's duty to provide compensation in exchange for the employee's duty to perform a service or obligation").

Although Plaintiff appears to seek stock options rather than reinstatement, the court perceives no meaningful difference between the two because Plaintiff's right to those benefits was tied to his continued employment. Notably, under South Carolina law, "a promise of continued employment is illusory where the nature of the relationship is at-will and the employer retains the right to terminate the employment relationship." *Anthony*, 909 F. Supp. 2d at 482 (citing *Poole v. Incentives Unlimited, Inc.*, 525 S.E.2d 898, 900 (S.C. App. 1999)). *See White v. Roche Biomedical Laboratories, Inc.,* 807 F. Supp. 1212, 1219–20 (D.S.C. 1992) *aff'd*, 998 F.2d 1011 (4th Cir. 1993) ("a promise of employment for an indefinite duration with no restrictions on the employer's right to terminate is illusory since an employer who promises at-will employment has the right to renege on that promise at any time for any reason.").

In addition, the court agrees with Defendant that the allegations supporting the promissory estoppel claim are conclusory in nature and fail to provide the factual content necessary to state a plausible claim. For instance, Plaintiff omits the circumstances of Defendant's promise, e.g., who, what, when, and where, as well as the specific terms of the promise. Indeed, the allegation that "Defendant promised stock rights to Plaintiff as a benefit of his *continued* employment with Defendant" suggests that when Plaintiff's employment ended so

15

did his right to receive any benefits associated with the employment. The court will grant the motion to dismiss as to this claim.

IV. **Conversion**

Plaintiff alleges that "[t]here is a specific amount of money which should have been paid to Plaintiff in wages and benefits"; "[s]uch monies . . . were not paid to Plaintiff or put in Plaintiff's name"; and that "Defendant converted the monies that should have been paid to Plaintiff for its own benefit." ECF No. 1-1 at ¶¶ 59-60. Defendant moves to dismiss the conversion claim on the basis that an employer's failure to pay wages and benefits does not constitute conversion and that Plaintiff fails to sufficiently plead entitlement to the compensation he seeks. ECF No. 5-1 at 15.

"Conversion is defined as the unauthorized assumption in the exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the owner's rights." *Glover v. UPS*, No. 6:16-1985-TMC, 2017 WL 1160420, at *5 (D.S.C. Mar. 29, 2017) (quoting *Moseley v. Oswald*, 656 S.E.2d 380, 382 (2008)). To prove the tort of conversion under South Carolina law, the plaintiff "must establish either title to or right to the possession of the personal property." *Joe Hand Promotions, Inc. v. Double Down Entertainment, LLC*, No. 0:11–cv–02438–MBS, 2014 WL 994382, at *8 (D.S.C. Mar. 13, 2014).

Plaintiff alleges throughout the complaint and in his response to the motion to dismiss that the damages he seeks amount to unpaid wages and benefits. However, the "failure to pay wages cannot support a claim for conversion under South Carolina law." *Flowers v. Premier V.T.L., LLC*, No. 2:18-1279-RMG, 2018 WL 3014820, at *2 (D.S.C. June 15, 2018) (citing *Owens v. Zippy Mart of S.C, Inc.,* 234 S.E.2d 217, 218 (S.C. 1977) (holding "there can be no conversion where there is a mere obligation to pay a debt," and, "[t]hus where there is merely the

16

relationship of debtor and creditor, an action based on conversion of the funds representing the debt is improper") (citations omitted).  Plaintiff argues in response to the motion to dismiss that *Flowers* is distinguishable because the court did not address whether the defendant "willfully converted Flower's [sic] interest in the monies for its own benefit."  ECF No. 10 at 12.  Additionally, Plaintiff contends, it is not clear whether the ruling in *Flowers* "applies to the type of monies at issue in this case."  *Id.*  This court disagrees that *Flowers* is distinguishable on those bases.  It is clear under *Owens* that a scenario in which an employer withholds or refuses to pay wages is analogous to a debtor/creditor relationship, which cannot give rise to a conversion claim.  Furthermore, as discussed throughout this order, Plaintiff has not sufficiently alleged that he has a right, recognized by law, to possession of the compensation he seeks in this lawsuit.  For these reasons, the court will grant the motion to dismiss as to this claim.

**V.      Defamation**

In Plaintiff's fifth and final cause of action, he asserts a claim for defamation *per se* on the basis that Defendant "falsely accused [him] of multiple compliance violations and terminated [him] suddenly, giving rise to a defamatory insinuation and inference against him."  ECF No. 1-1 at ¶ 69.  Plaintiff alleges that "[f]urther defamation occurred by word from Snider, speaking on behalf of Defendant as Vice President of Sales, when he also falsely accused Plaintiff of having two compliance violations, seemingly referring to some other purported time in addition to the termination allegation."  *Id.* at ¶ 71.  As a result, Plaintiff alleges, his "personal and professional reputation has been damaged, he has suffered physical and emotional distress, mental anguish, humiliation, and he has also suffered the loss of earnings."  *Id.* at ¶ 76.  Defendant argues that Plaintiff fails to allege facts showing Defendant published a defamatory statement and that Plaintiff cannot base his defamation claim on the act of termination.

"The tort of defamation allows a plaintiff to recover for injury to his or her reputation as the result of the defendant's communications to others of a false message about the plaintiff." *Parrish v. Allison*, 656 S.E.2d 382, 388 (S.C. App. 2007) (citations omitted). To establish a claim for defamation, the plaintiff must show "(1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Argoe v. Three Rivers Behavioral Health, LLC*, 710 S.E.2d 67, 74 (S.C. 2011). "A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating with him." *Parrish*, 656 S.E.2d at 389 (citations omitted). "If the defamatory meaning of a message or statement is obvious on the face of the statement, the statement is defamatory *per se*." *Id.* A claim for defamation must "state with specificity the time, place, medium, and listener of the alleged defamatory statements." *Doe v. Cannon*, No 2:16-cv-00530-RMG, 2017 WL 591121, at *1 (D.S.C. Feb. 14, 2017) (citing *Caudle v. Thomason*, 942 F. Supp. 635, 638 (D.D.C. 1996) ("[I]n order to plead defamation, a plaintiff should allege specific defamatory comments [including] 'the time, place, content, speaker, and listener of the alleged defamatory matter.'").

Defendant argues that Plaintiff "fails to allege any facts showing that Defendant made or published any false and defamatory statements to a third party." ECF No. 5-1 at 17. In response, Plaintiff asserts that he alleges that "[t]hrough the termination act and the works of Defendant's employees, the purported reason for Plaintiff's separation and other false claims about compliance violations were published to the public and individuals outside of the need-to-know basis." ECF No. 10 at 14 (citing ECF No. 1-1 at ¶ 73). This statement finds no support throughout the rest of the complaint. According to the complaint, the defamatory comment is the

18

accusation that Plaintiff promoted "off-label use of medicine." ECF No. 1-1 at ¶ 25. Also according to the complaint, Mr. Snider is Defendant's representative who fired Plaintiff during a telephone call with Plaintiff and "HR." *Id.* at ¶¶ 15-22. Nowhere in the complaint does Plaintiff allege that Mr. Snider (or the human resources representative) communicated to any third party that Plaintiff promoted the off-label use of medicine. Nowhere in the complaint does Plaintiff allege that Mr. Snider, the human resources representative, or anyone else representing Defendant communicated to any third party that Defendant fired Plaintiff as a result of his promotion of the off-label use of medicine. *Cf. Odom v. CVS Caremark Corp.*, No. 3:14–456–MGL–SVH, 2014 WL 7733823, at *4 (D.S.C. Dec. 12, 2014) (recommending dismissal of former employee's defamation claim where the complaint alleged generally that employer "falsely accused plaintiff of falsifying documents, terminated him for these false accusations, and published the false grounds to Plaintiff's coworkers, the South Carolina Department of Health and Environmental Control, and the public at large"), *report and recommendation adopted as modified*, 2015 WL 412833 (D.S.C. Jan. 30, 2015). Accordingly, Plaintiff has not alleged the necessary facts to satisfy the element of the claim that the unprivileged publication was made to a third party. The court will grant the motion to dismiss as to this claim.

VI. **Leave to Amend**

As a final matter, in his response to the motion to dismiss Plaintiff seeks leave to amend his complaint in the event the court should "determine that deficiencies exist in the current pleadings." ECF No. 10 at 16. Defendant opposes the request on the basis that Plaintiff has not properly moved for leave to amend, has not submitted a proposed amended complaint, and that, in any event, amendment would be futile. ECF No. 11 at 14.

19

At this time, Plaintiff may amend his pleading only with Defendant's consent or the court's leave. The Federal Rules of Civil Procedure specify that the court should freely give leave to amend when justice so requires. Fed. R. Civ. 15(a)(2). The court finds that enough of the deficiencies discussed herein are owing to a lack of factual development and content and therefore could conceivably be cured by amendment. Accordingly, the court is unwilling to conclude at this time that any amendment would be futile, and therefore will grant Plaintiff leave to move to amend his complaint.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss is DENIED without prejudice. ECF No. 5. Plaintiff may file a motion for leave to amend his complaint with a proposed amended complaint attached within fourteen calendar days of the date of this order.

**IT IS SO ORDERED.**

Dated: August 13, 2019
Charleston, South Carolina

/s/Margaret B. Seymour
Margaret B. Seymour
Senior United States District Judge